Section 8, we can only speculate whether in its final form, that display will offend the Constitution.  A case requiring this kind of speculation for its resolution is not ripe.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0354P (6th Cir.)
File Name:  02a0354p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

Rabbi JONATHAN ADLAND;
Reverend JOHANNA BOS;
Reverend JAMES JERRELL
GREENLEE; Reverend
GILBERT SCHROERLUCKE;
JEFF VESSELS; and AMERICAN
CIVIL LIBERTIES UNION OF
KENTUCKY,
     *Plaintiffs-Appellees,*

     *v.*

ARMOND RUSS, in his official
capacity as Commissioner of
the Department for Facilities
Management,
     *Defendant-Appellant.*

No. 00-6139

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 00-00051—Joseph M. Hood, District Judge.

Argued:  November 2, 2001

Decided and Filed:  October 9, 2002

Before:  MARTIN, Chief Circuit Judge; BATCHELDER, Circuit Judge; SARGUS, District Judge.[*]

---

**COUNSEL**

**ARGUED:**    Jennifer L. Carrico, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellant.    David A. Friedman, AMERICAN CIVIL LIBERTIES UNION OF KENTUCKY, Louisville, Kentucky, for Appellees. **ON BRIEF:** Jennifer L. Carrico, Scott White, OFFICE OF THE ATTORNEY GENERAL, Frankfort, Kentucky, for Appellant.  David A. Friedman, AMERICAN CIVIL LIBERTIES UNION OF KENTUCKY, Louisville, Kentucky, C. Laurie Griffith, GRIFFITH LAW OFFICES, Louisville, Kentucky, for Appellees.

MARTIN, C. J., delivered the opinion of the court. SARGUS, D. J. (p. 29), delivered a separate concurring opinion. BATCHELDER, J. (pp. 30-36), delivered a separate dissenting opinion.

---

**OPINION**

---

BOYCE F. MARTIN, JR., Chief Circuit Judge.  On April 21, 2000, Kentucky Governor Paul E. Patton signed into law Senate Joint Resolution No. 57, a resolution "relating to the display of historic documents that include a depiction of the Ten Commandments."  The Resolution contains two primary substantive provisions – Section 2, which authorizes a public school teacher to post the Ten Commandments in a classroom when incorporated into a historical display, and Section 8, which directs the Department for Facilities

[*] The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

[respondent] must bring its challenge now in order to get relief.").

The Supreme Court's recent decision in *Sante Fe Independent School District v. Doe*, 530 U.S. 290 (2000), supports this conclusion.  In *Sante Fe* the Court ruled unconstitutional a system in which the school allowed the student body, through balloting, to determine whether an invocation would be given at school football games and who would give the invocation should the student body elect to have one.  *Id.* at 296-98.  Important for our purposes, the Court rejected the school district's argument that the case was not ripe because no prayer had actually yet been given. *Id.* at 313-16.  The Court found that the case was ripe because an injury had occurred when the district enacted a policy which, on its face, revealed a purpose that itself violated the Establishment Clause.  *Id.* at 313-17.  The clear evidence of this purpose, the Court held, was the policy's language using the religious term "invocation" with no secular alternatives, and the policy's decision-making mechanism permitting the Christian majority to impose its views on the non-Christian minority.  *Id.*  Here, no religious purpose is apparent on the face of Section 8 of Senate Joint Resolution No. 57 because, as this opinion has explained, Section 8 calls for the Ten Commandments monument to be *part* of an historical and cultural display.  *See also Wheeler v. Barrera*, 417 U.S. 402, 426 (1974) (ruling that an Establishment Clause challenge to Title I funds, where the plaintiffs claimed that Title I would allow publicly paid teachers to be sent to parochial schools to teach, was not ripe because the state had a choice of many constitutional means with which to implement Title I).

The plaintiffs argue that because portions of Senate Joint Resolution 57—other than Section 8—contain overtly Christian references, and because Section 8 requires the historical display to include the Resolution itself, the display will not be able to survive an Establishment Clause challenge. The plaintiffs' complaint, however, challenged only Section 8 of the Resolution, and in the absence of any specific evidence detailing the composition of the display mandated by

evidence, this Court lacks a factual basis upon which to make a determination of the display's constitutionality.

Second, Section 8 contains no description of the content of the "historical and cultural display" into which the monument is to be incorporated, and to date, no such display has been assembled. We are left to speculate about whether that display will be sufficiently historical and cultural to offset the religious tone of the monument or whether the display of the monument will be forbidden because of an explicitly religious message. The monument itself depicts the Ten Commandments as only one—albeit the most prominent one—of several messages, and in its implementation of Section 8, the Commonwealth might include in the display any number of other things relevant to the historical and cultural influences on the development of Kentucky law, which might well neutralize any message of endorsement of religion by the Commonwealth. The Magna Charta, the Declaration of Independence and the Constitution of United States come immediately to mind, not to mention Daniel Boone, long rifles and Indians. An historical display containing numerous nonreligious items would be akin to the display upheld in *Lynch*, 465 U.S. at 687 (O'Connor, J., concurring), where the Court found that the nonexclusive nature of the display evidenced the city's desire to celebrate the holiday season.

Third, the plaintiffs have not shown that they would suffer any hardship now if relief is denied. They would not suffer any immediate economic harm, *Abbot Labs.*, 387 U.S. at 152-53, nor would they suffer risk of prosecution by the state, *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298-99 (1979), nor would their constitutional speech or conduct be chilled, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). Their worry that they might encounter a display in which the Ten Commandments monument is placed in such a way that it violates the Establishment Clause may be legitimate, but it is not legally cognizable at this point. *See, e.g., Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998) ("[W]e do not find a strong reason why the

Management to "relocate the monument inscribed with the Ten Commandments which was displayed on the Capitol grounds for nearly three decades to a permanent site on the Capitol grounds near Kentucky's floral clock to be made part of a historical and cultural display including the display of this order to remind Kentuckians of the Biblical foundations of the laws of the Commonwealth." Plaintiffs, Rabbi Jonathan Adland, Reverend Johanna Bos, Reverend James Jerrell Greenlee, Reverend Gilbert Schroerlucke, the American Civil Liberties Union of Kentucky and its executive director Jeff Vessels, filed suit seeking to permanently enjoin the defendant Armand Russ, Commissioner of the Commonwealth of Kentucky Department for Facilities Management, from complying with Section 8. By agreement of the parties, the district court heard the matter on the merits. In a careful and thoughtful opinion, the district court declared Section 8 of Kentucky Senate Joint Resolution Number 57 unconstitutional under the Establishment Clause of the First Amendment and permanently enjoined the defendant from complying with Section 8. We AFFIRM.

## I.

### A.

The Ten Commandments monument was presented to the Commonwealth by the Fraternal Order of Eagles, a national service organization dedicated to promoting liberty, truth and justice, in 1971.[1] In offering to donate the monument to the

---

[1] As recounted in a Seventh Circuit decision addressing an Establishment Clause challenge to an identical Ten Commandments monument in Elkhart, Indiana, the original impetus for the Eagles' nationwide donation of Ten Commandments monuments came from E.J. Ruegmer, a juvenile court judge in Minnesota. *Books v. City of Elkhart, Indiana*, 235 F.3d 292, 294 (7th Cir. 2000), *cert. denied*, 532 U.S. 1058 (2001); *see also Summum v. City of Ogden*, No. 01-4022, 2002 WL 1609753, at *1 (10th Cir. July 19, 2002). Judge Ruegmer was disillusioned by juvenile crime and believed that the Ten Commandments could provide a common code of conduct. *Id.*

Commonwealth, the Eagles explained in a March 14, 1971, letter that:

> Most of today's younger generation either have not seen the Ten Commandments or have not been taught them. In our opinion the youth of today is in dire need of learning the simple laws of God if we are to attain love and charity necessary to create peace among the peoples of all nations.

The granite monument, which is over six feet tall and almost four feet wide, bears an inscription of the following version of the Ten Commandments:

> I AM the LORD thy God.
> Thou shalt have no other gods before me.
> Thou shalt not make to thyself any graven images.
> Thou shalt not take the name of the Lord thy God in vain.
> Remember the Sabbath day, to keep it holy.
> Honor thy father and thy mother, that thy days may be long upon the land which the Lord thy God giveth thee.
> Thou shalt not kill.
> Thou shall not commit adultery.
> Thou shalt not steal.
> Thou shalt not bear false witness against thy neighbor.
> Thou shalt not covet thy neighbor's house.
> Thou shalt not covet thy neighbor's wife, nor his manservant, nor his maidservant, nor his cattle, nor anything that is thy neighbor's.

At the top of the monument, there are two small tablets containing ancient Hebrew script. Surrounding these tablets is a floral design, and between the tablets is the all-seeing eye, similar to the one depicted on the dollar bill. Immediately below the eye is an American eagle grasping the American flag. Below the text of the monument are two small Stars of David, and in the center of the stars is a similarly-sized symbol representing Christ: two Greek letters, Chi and Rho, superimposed upon each other. At the base of the monument is a small scroll, which reads: "Presented to the

to Liberty" sign, conveyed a secular "winter-holiday" message, in Justice Blackman's estimation. *Id.* at 616 (Blackmun, J., opinion).

From *Lynch* and *County of Allegheny* we learn that public displays may, consistent with the Court's interpretation of the Establishment Clause, have a religious component and religious symbolism so long as the message from the display is neither completely religious nor exclusive of other religions. The unconstitutional display in *County of Allegheny* was entirely Christian, whereas the permissible displays in that case and in *Lynch* were more inclusive and less overtly religious. Applying that distinction, this circuit, in *Doe v. City of Clawson*, 915 F.2d 244 (6th Cir. 1990), upheld a nativity scene based on a number of factors, one of which was the presence of other, nonreligious figures and messages. Besides the traditional Holy Family figures, there was a Santa Claus figure, a Noel sign, and a number of other holiday decorations conveying an overall message of celebrating the holiday, but not the religious nature of the holiday. *Id.* at 248-49. *See also Washegesic v. Bloomingdale Pub. Sch.*, 33 F.3d 679, 683 (6th Cir. 1994), *cert. denied*, 514 U.S. 1095 (1995) (citing *Stone* for the propositions that the constitutional infirmity of posting the Ten Commandments resulted from the fact that the display was not integrated with other displays or a course of study).

After reviewing these precedents, I conclude that this claim is not ripe for adjudication. At this point the plaintiffs' claim does not satisfy any of the factors set forth in *Magaw*, 132 F.3d at 284, namely: a likelihood that the harm complained of will actually occur; that the record is sufficiently developed to make the case fit for judicial resolution; and that the parties will suffer hardship if relief is denied. First, because there is no evidence in the record to tell us what will comprise the "historical display" of which the Ten Commandments monument will be a part, I conclude that the plaintiffs have not demonstrated that the harm they complain of will ever come to pass, much less that the "injury in fact [is] certainly impending." *Magaw*, 132 F.3d at 280. And without this

comparative religion, or the like." *Id.* at 42 (citing *Sch. Dist. of Abington Township v. Schempp*, 374 U.S. 203, 225 (1963)).

The Supreme Court used similar reasoning in *Lynch v. Donnelly*, 465 U.S. at 668, where the Court upheld a town's Christmas display consisting of a creche scene and a large variety of both religious and nonreligious items. *Id.* at 671. Finding an "unbroken history of official acknowledgment by all three branches of government of the role of religion in American life," the Court reviewed the country's history of governmental recognition of, and in fact, subsidizing of holidays having a religious significance, as well as the governmental acknowledgment of the country's religious heritage. *Id.* at 674-77. The Court concluded that the constitutionality of the Christmas display must be determined by examining the display as a whole, and not by focusing inordinately on the creche scene, and viewed in that manner, the display did not offend the Establishment Clause. *Id.* at 680. In a concurring opinion, Justice O'Connor concluded that the town did not "intend" either to endorse Christianity or express disapproval of non-Christian religions, but wanted only to celebrate a "public holiday through its traditional symbols." *Id.* at 691 (O'Connor, J., concurring). Justice O'Connor analogized the nativity scene to a museum display of religious artifacts; the religious message is still communicated but there is no endorsement of the message by the museum. *Id.* at 692.

A locality's holiday displays were again challenged in *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573 (1989). One display, which was held unconstitutional by the Court, was an unmistakably Christian nativity scene, while the other display, located outside another public building, consisted of a Christmas tree, a "Salute to Liberty" sign and a Chanukah menorah. *Id.* at 578. As the majority discusses above, the Court found the county's nativity scene unconstitutional because there were no offsetting nonreligious displays to detract from its religious message, *id.* at 598-602, but found that the Chanukah menorah and Christmas tree, in conjunction with the "Salute

Commonwealth of Kentucky by Kentucky State Aerie Fraternal Order of Eagles 1971."

Contrary to the statement in Section 8 of the Resolution, the district court found that the monument was displayed on Capitol grounds until approximately 1980. It was removed to make room for construction on the Capitol grounds and has remained in storage since that time.

### B.

The Resolution contains a preamble consisting of seventeen "Whereas" clauses that recite the Senate's purpose in enacting this Resolution. Ten of the clauses quote famous Americans – Samuel Adams, Fisher Ames, George Washington, Andrew Jackson, John Quincy Adams, Abigail Adams, Woodrow Wilson, and Jimmy Carter – professing their beliefs in the Bible, God, or Christianity. For example, the Resolution quotes Andrew Jackson's May 29, 1845, statement:

> My lamp of life is nearly out, and the last glimmer has come. I am ready to depart when called. The Bible is true. The principles and statutes of that Holy Book have been the rule of my life, and I have tried to conform to its spirit as nearly as possible. Upon that sacred volume I rest my hope for eternal salvation, through the merits and blood of our blessed Lord and Savior, Jesus Christ.

Similarly, the Resolution quotes George Washington's September 19, 1796, declaration: "Of all the dispositions and habits which lead to political prosperity, religion and morality are indispensable supports." The Resolution also quotes Woodrow Wilson's statement:

> The Bible is the word of life. I beg that you will read it and find this out for yourselves . . . .You will find it full of real men and women not only, but also of things you have wondered about and had been troubled about all your life, as men have been always; and the more you read, the more it will become plain to you what things are worthwhile and what are not, what things make men

happy – loyalty, right dealings, speaking the truth, readiness to give everything for what they think their duty, and most of all, the wish that they may have the real approval of the Christ, who gave everything for them . . . .When you have read the Bible, you will know it is the Word of God, because you will have found it the key to your own heart, your own happiness, and your own duty.

In addition, the Resolution also employs quotes from a 1892 United States Supreme Court decision which, viewed in isolation, conclude that the Supreme Court has declared the United States to be a "Christian nation." Four other clauses incorporate miscellaneous quotations regarding God or the Bible in pre-Revolutionary legislative sources or in Kentucky law. One of the clauses also references the presence of the Ten Commandments in the United States Supreme Court chambers as part of a frieze containing several historical law givers.

Section 8 of the Resolution directs that the monument be relocated to the Capitol grounds, the seat of the Commonwealth's government, near Kentucky's Floral Clock, a large clock planted with 13,000 Alternanthera and Santolina plants. The clock is thirty-four feet in diameter and weighs 200,000 pounds, and according to the Commonwealth, it is one of the largest clocks in the world. The Floral Clock area is a prominent and central feature on the Capitol grounds which can be seen from the circular drive leading up to the Capitol plaza and the public parking area.

According to Section 8, the Ten Commandments monument will be part of a "historical and cultural display." The Resolution does not delineate the specific components of this display, but the Commonwealth in its brief clarifies that this display will consist of the "markers, signs and monuments" in the "historical garden area surrounding the Kentucky Floral Clock." (Appellant's Brief at 7). These markers include: (1) a Kentucky Historical Society memorial sign commemorating "A Civil War Reprisal" and describing

The ripeness doctrine is designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). "Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997). The Supreme Court has instructed that we are to make a two-fold inquiry: we must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149. A claim, to be ripe for review, must satisfy both criteria. *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1362 (6th Cir. 1995). This circuit has interpreted the ripeness inquiry to include consideration of the likelihood that the harm complained of will actually occur; whether the record is sufficiently developed to make the case fit for judicial resolution; and hardship to the parties if relief is denied. *Magaw*, 132 F.3d at 284. As I shall explain, this case is not ripe.

The majority discusses a number of Supreme Court cases that provide guidance in determining whether a challenge to a religious display or figure erected on public property brought under the Establishment Clause is ripe for review. In *Stone v. Graham*, 449 U.S. at 39, the Supreme Court ruled that a Kentucky statute requiring the posting of the Ten Commandments in each public school classroom violated the Establishment Clause. While the Court, following *Lemon*, rejected the Commonwealth's proffered secular purpose as "self-serving" and "not sufficient to avoid conflict with the First Amendment," *id.* at 41 (citation omitted), it noted that this singular display of the Ten Commandments was entirely different from an integration of the Ten Commandments into the school curriculum, "where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics,

## DISSENT

ALICE M. BATCHELDER, Circuit Judge, dissenting. The majority today rules on the constitutionality of a historical and cultural display that is still being planned and has yet to be erected. Because the jurisdiction of the federal courts extends only to cases that are ripe for review, I respectfully dissent.

### I.

Before this Court may address the plaintiffs' contention that Section 8 of Senate Joint Resolution No. 57 violates the Establishment Clause, we must be certain that we have jurisdiction—that is, we must determine whether the plaintiffs present an actual "case" or "controversy" within the meaning of Article III of the Constitution. We review this question of federal jurisdiction de novo. *Greater Detroit Res. Recovery Auth. v. United States EPA*, 916 F.2d 317, 319 (6th Cir. 1990).

Of particular concern here is whether this case is ripe for review. "Ripeness is more than a mere procedural question; it is determinative of jurisdiction. If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed. This deficiency may be raised sua sponte if not raised by the parties." *Bigelow v. Mich. Dep't of Natural Res.*, 970 F.2d 154, 157 (6th Cir. 1992) (quoting *S. Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir. 1990)). *See also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93 (1998); *Louisville & Nashville R.R. v. Mottley*, 211 U.S. 149, 152 (1908); *Franzel v. Kerr Mfg. Co.*, 959 F.2d 628, 630 & n.1 (6th Cir. 1992). "[R]ipeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Reno v. Catholic Soc. Servs., Inc.,* 509 U.S. 43, 57 n.18 (1993). Although neither party to this appeal raised the issue of ripeness, I will address it.

in detail a Kentucky Civil War event on the location; (2) a "Welcome to Kentucky" bronze plaque; (3) the Kentucky Coffee Tree Marker commemorating Joe Cross Creason, Sr., humorist, author and journalist; (4) the Freedom Tree Marker memorializing Kentucky Vietnam Prisoners of War; (5) a stone marker in memory of Charles Wickliffe, Finance and Administration Cabinet, 1960-1995; (6) a plaque in memory of Governor Bert Combs, in recognition of courageous leadership, 1959-1963; and, (7) a memorial for John Stony Spicer, Physical Plant Director, 1958-1988. As the Commonwealth states in its reply brief, "Together with these surrounding markers and memorials, the monument will be one 'part of a historical and cultural display' established by the Resolution." (Appellant's Reply Brief at 10-11).

If the Ten Commandments monument was re-located to this area it would be the largest monument in the area, except for the Floral Clock. Both the Floral Clock and the Ten Commandments monument would be visible to motorists driving on the road between the Capitol and the Capitol Annex.

### II.

In reviewing a district court's grant of a permanent injunction, we review the district court's conclusions of law and its findings of constitutional, or ultimate, facts *de novo*. *See Grutter v. Bollinger*, 288 F.3d 732, 743 (6th Cir. 2002). We review the district court's findings of subsidiary facts for clear error. *Deja Vu v. Metro. Gov't of Nashville*, 274 F.3d 377, 389 (6th Cir. 2001). Factual findings are clearly erroneous only if this court is "left with the definite and firm conviction that a mistake has been committed." *United States v. Hopkins*, 295 F.3d 549, 551 (6th Cir. 2002).

### III.

In the district court, the defendant argued that the plaintiffs lacked standing to pursue this action. Although they do not raise this argument on appeal, we must nevertheless verify that the plaintiffs had standing to pursue this action in the

district court.  *See Harker v. Troutman* (*In re Troutman Enters., Inc.*), 286 F.3d 359, 364 (6th Cir. 2002) ("Standing is a jurisdictional element and we are under a continuing obligation to verify our jurisdiction over a particular case."); *see also CDI Info. Servs. v. Reno*, 278 F.3d 616, 618 (6th Cir. 2002) (noting that it is "incumbent" on the court "to verify the existence of subject matter jurisdiction").

In order to meet Article III standing requirements, a party must show (1) actual or threatened injury which is (2) fairly traceable to the challenged action and (3) a substantial likelihood the relief requested will redress or prevent the plaintiff's injury.  *Deja Vu*, 274 F.3d at 384.  In *Washegesic v. Bloomingdale Public Schools*, 33 F.3d 679, 681 (6th Cir. 1994), we held that a high school graduate had standing to challenge his high school alma mater's display of a portrait of Jesus Christ because he continued to visit the school and encounter the portrait.  We noted that "[t]he use of governmental authority to encourage a sectarian religious view is a sufficient injury if directed toward the plaintiff." *Id.* at 682; *see also Suhre v. Haywood County*, 131 F.3d 1083, 1088 (4th Cir. 1997) ("The cognizable injury caused by personal contact with a public religious display may thus satisfy the injury-in-fact requirement for standing to bring an Establishment Clause case."); *Murray v. City of Austin*, 947 F.2d 147, 151 (5th Cir. 1991) (ruling that plaintiff had standing to challenge City's inclusion of a cross in municipal logo); *Saladin v. City of Milledgeville*, 812 F.2d 687, 691-93 (11th Cir. 1987) (holding that plaintiffs had standing because plaintiffs were directly confronted by presence of word "Christianity" on the city seal.)  An Establishment Clause plaintiff need not allege that he or she avoids, or will avoid, the area containing the challenged display.  As the Fourth Circuit noted:

Compelling plaintiffs to avoid public schools or buildings is to impose on them a burden that no citizen should have to shoulder.  A public school or county courthouse exists to serve *all* citizens of a community, whatever their faith may be.  Rules of standing that

---

## CONCURRENCE

---

SARGUS, District Judge.  I concur in the opinion of Chief Judge Martin.  I write separately to note that our decision is compelled by the Supreme Court's decision in *Stone v. Graham*, 449 U.S. 39, 101 S. Ct. 192, 66 L. Ed. 2d 199 (1980) (per curiam) which found unconstitutional a Kentucky statute requiring the placement of the Ten Commandments in all public school classrooms.  Further,

[T]he Ten Commandments are not in peril.  They may be displayed in every church, synagogue, temple, mosque, home and storefront.  They may be displayed on lawns and in corporate board rooms.  Where this precious gift cannot, and should not, be displayed as a *religious text* is on government property.

*Harvey v. Cobb County, Ga.*, 811 F. Supp. 669, 670 (N.D. Ga. 1993) (emphasis added), *aff'd* 15 F.3d 1097 (11th Cir.), *cert. denied*, 511 U.S. 1129 (1994).

Finally, as the majority opinion makes clear, the Ten Commandments, which played a most significant role in the development of positive law and western civilization, may be displayed on public property in the context of their historical significance.  Our Constitution does not permit, however, a state to select or favor one religious creed over another.

### V.

We emphasize that in declaring Section 8 unconstitutional and permanently enjoining the defendant from complying with that statutory directive, we do not hold that the Commonwealth of Kentucky can never display the Ten Commandments or this monument in particular. To the contrary, we believe that the Supreme Court's opinion in *Stone* and Justice Stevens' statements in *Allegheny* not only acknowledge that the Ten Commandments may be constitutionally displayed, they provide considerable guidance how they can be displayed. The plaintiffs also recognize this fact in that they have not advocated a ban on the public display of the Ten Commandments or any such extreme remedy. Indeed, to their credit, they proposed a number of alternative displays in the district court, including a historical display showcasing the various influences on our law by both secular and religious sources. While we cannot pass on the merits of plaintiffs' proposals, we are nevertheless confident that with careful planning and deliberation, and perhaps consultation with the plaintiffs, the Commonwealth can permissibly display the monument in question.

### VI.

For the foregoing reasons, we affirm the district court's decision declaring Section 8 of the Kentucky Senate Resolution No. 57 unconstitutional under the Establishment Clause of the First Amendment and affirm its decision to permanently enjoin the defendant Commissioner of the Department for Facilities Management from complying with Section 8.

require plaintiffs to avoid public places would make religious minorities into outcasts. Forcing an Establishment Clause plaintiff to avoid the display of which he complains in order to gain standing to challenge it only imposes an extra penalty on individuals already alleged to be suffering a violation of their constitutional rights.

*Suhre*, 131 F.3d at 1088.

The complaint, which the individual plaintiffs each verified, indicates that Rabbi Adland, Reverend Bos, Reverend Greenlee, Reverend Schroerlucke and Executive Director Vessels frequently travel to the State Capitol to engage in political advocacy for a variety of organizations and that they will endure direct and unwelcome contact with the Ten Commandments monument. In light of *Washegesic*, we conclude that the plaintiffs satisfy the injury-in-fact requirement. We also find that the this injury is plainly caused by the defendant's statutory directive to erect the Ten Commandments and that an injunction can redress plaintiffs' injury. Thus, we are satisfied that the individual plaintiffs had standing to pursue this action in the district court.

As to the American Civil Liberties Union, an organization has standing to sue on behalf of its members "when (a) its members otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm.*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). First, various members of the American Civil Liberties Union travel to the Capitol, all of whom would come into direct, unwelcome contact with the monument. Second, according to a declaration attached to the complaint, the ACLU advocates the separation of church and state and has "devoted substantial effort and resources to defending what Thomas Jefferson called 'the wall of separation between church and state' created by the two religion clauses of the

First Amendment." Thus, this suit furthers the organization's interest. Third, there does not appear to be any basis to require the participation of all 1,800 Kentucky ACLU members. Accordingly, we find that the ACLU had organizational standing to seek relief in the district court.

## IV.

The Establishment Clause of the First Amendment, made applicable to states through the Fourteenth Amendment, *see Everson v. Bd. of Educ.*, 330 U.S. 1, 8, 67 S.Ct. 504, 91 L.Ed. 711 (1947), provides that "Congress shall make no law respecting any establishment of religion." U.S. Const., Amend. I. "The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious beliefs or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *County of Allegheny v. American Civil Liberties Union*, 492 U.S. 573, 594, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)).

Whether a particular government action violates the Establishment Clause depends on the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). While we have recognized that individual Supreme Court justices have expressed reservations regarding the *Lemon* test, *see American Civil Liberties Union of Ohio v. Capitol Square Review & Advisory Bd.*, 243 F.3d 289, 306 & n. 15 (6th Cir. 2001) (collecting opinions), we are an intermediate federal court and are bound to follow this test until the Supreme Court explicitly overrules or abandons it. *See Grutter*, 288 F.3d at 743.

Under the *Lemon* test, we consider whether (1) the government activity in question has a secular purpose, (2) whether the activity's primary effect advances or inhibits religion, and (3) whether the government activity fosters an excessive entanglement with religion. *Lemon*, 403 U.S. at 612. Although this remains the original formulation, we have recognized that in recent years, the Supreme Court has

liberty" – a reader must do more than glance at the Resolution; he or she must read the fine print. *See Allegheny*, 492 U.S. at 582. And in reading this print, the viewer must first encounter statements "The Bible is true," and "The Bible is the word of life," before he or she comes to any sort of disclaimer of religious purpose. As the defendant recognizes, these statements, along with the other statements in preamble, have "religious meaning." (Rep. Br. at 13). We therefore find that to the extent a disclaimer could mitigate the endorsement inherent in displaying the Ten Commandments on the State Capitol grounds, the Commonwealth's current disclaimer is not only ineffective, but includes language expressly endorsing the Bible and Christianity.

Given that (1) the Commonwealth intends to display a document that is inherently religious, *see Stone*, 449 U.S. at 41; (2) the display will be on the grounds of the State Capitol; (3) the format of the monument emphasizes the Commandments' religious directives; (4) the Ten Commandments monument will be the largest monument in the display; (5) the intended "cultural and historical display" set forth in Section 8 lacks a readily discernible unifying theme, and; (6) the Resolution, which will be posted with the monument, tends to amplify the religious message, we hold that the defendant cannot comply with Section 8 without impermissibly endorsing religion.

The ultimate effect of this endorsement is to send "the ancillary message to members of the audience who are nonadherents 'that they are outsiders, not full members of the political community, and the accompanying message to adherents that they are insiders, favored members of the political community.'" *Santa Fe Indep. Sch. Dist.*, 538 U.S. at 309-310 (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring)).[5]

---

[5] Because we find that Section 8 does not have a valid secular purpose and that it has the impermissible effect of endorsing religion, we do not reach the question of whether Section 8 unconstitutionally entangles the Commonwealth with religion.

monuments separately. If a reasonable observer views the monuments separately, unconnected by a common context, his or her attention is naturally drawn to the Ten Commandments monument, the largest monument in the display, and its accompanying religious message.

6.

As we have noted throughout this opinion, the Ten Commandments convey a religious message, a message that cannot be diminished by a simple recitation that the display is not for religious purposes. *See Stone*, 449 U.S. at 42; *see also Allegheny*, 492 U.S. at 619 (noting that "no sign can disclaim an overwhelming message of endorsement"). Nevertheless, the Commonwealth contends that the disclaimers set forth in the Resolution, which will be on display along with the Ten Commandments, sufficiently offset the religious message of the Ten Commandments. To the extent *Stone* has not already foreclosed this argument, we find that the disclaimer is ineffective and that the language of the Resolution emphasizes, rather than downplays, the religious nature of the monument.

Initially, we note that neither Section 8 nor the preamble clauses contain an explicit disclaimer that the display of the Ten Commandments is not intended to advance or promote religion. Thus, while the Commonwealth emphasizes that the Resolution expressly disclaims any religious purpose, these disclaimers are found in Section 2, the provision addressing the Ten Commandments in public schools, and Section 3, which concerns posting by a fiscal court, city council, or school board.

Instead of an express disclaimer, Section 8 provides an avowed statement of secular purpose. While such a statement may be sufficient to dilute religious endorsement, *see Brooks*, 222 F.3d at 266, the disclaimer implied in Section 8 is problematic. While it is not entirely clear how the Resolution will be portrayed on the display, the language of Section 8 is located on the very last page of the Resolution. Unlike the disclaimer in *Allegheny* – a sign proclaiming "A salute to

applied what is known as the "endorsement" test, which looks to whether a reasonable observer would believe that a particular action constitutes an endorsement of religion by the government. *See Granzeier v. Middleton*, 173 F.3d 568, 573 (6th Cir. 1999) (collecting cases); *Hawley v. City of Cleveland*, 24 F.3d 814, 827 (6th Cir. 1994). While we have variously interpreted the endorsement test as a refinement or modification of the first and second prongs, *see American Civil Liberties Union v. City of Birmingham*, 791 F.2d 1561, 1563 (6th Cir. 1986), a clarification of the first prong, *see Chaudhuri v. State of Tennessee*, 130 F.3d 232, 236 (6th Cir. 1997), and as a modification of the entire *Lemon* test, *see Pinette v. Capitol Square Review & Advisory Bd.*, 30 F.3d 675, 678-79 (6th Cir. 1994) *aff'd*, 515 U.S. 753, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), we follow our en banc decision in *Americans United for Separation of Church and State v. City of Grand Rapids*, 980 F.2d 1538 (6th Cir. 1992), and the recent panel decisions in *Brooks v. City of Oak Park*, 222 F.3d 259, 264 (6th Cir. 2000), *cert. denied*, 531 U.S. 1152 (2001), and *Granzeier*, and treat the endorsement test as a refinement of the second *Lemon* prong.

A.

"The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion." *Edwards v. Aguillard*, 482 U.S. 578, 585, 107 S.Ct. 2573, 96 L.E.2d 510 (1987) (quoting *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring)). Such an intention to promote religion is plain when the State enacts a law to serve a religious purpose, either through the promotion of religion in general or the advancement of a particular religious belief. *Id.* Although a "totally secular purpose is not required," *City of Birmingham*, 791 F.2d at 1565, it is clear that the secular purpose "requirement is not satisfied . . . by the mere existence of some secular purpose, however dominated by religious purposes." *Lynch*, 465 U.S. at 690-91 (O'Connor, J., concurring). While we accord some deference to the Commonwealth's avowed intention, it nevertheless remains our task to "distinguish a sham secular purpose from a sincere

one." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000).

In *Stone v. Graham*, 449 U.S. 39, 41-42, 101 S.Ct. 192, 66 L.E.2d 199 (1980) (per curiam), the Supreme Court summarily struck down a Kentucky statute requiring schools to post copies of the Ten Commandments in each classroom. Each display of the Ten Commandments was to be posted with the statement: "The secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States." *Id.* at 41 (quoting 1978 Ky. Act, ch. 436, § 158.178 (1980)). The Court rejected this avowed secular purpose, explaining that: "The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to the fact." *Id.* at 41; *see also Books v. City of Elkhart, Indiana*, 235 F.3d 292, 302 (6th Cir. 2000), *cert. denied*, 532 U.S. 1058 (2001) (finding that the Ten Commandments, standing alone, cannot be stripped of "their religious, indeed sacred, significance and characterized as a moral or ethical document"); *see generally School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 223, 83 S.Ct. 1560, 10 L.E.2d 844 (1963) (holding unconstitutional a statute "requiring the selection and reading at the opening of the school day of verses from the Holy Bible and the recitation of the Lord's Prayer by the students in unison," despite the proffer of such secular purposes as "the promotion of moral value, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature."). The Ten Commandments "do not confine themselves to arguably secular matters, such as honoring one's parents, killing or murder, adultery, stealing, false witness, and covetousness." *Stone*, 449 U.S. at 41-42 (internal citations omitted). "Rather the first part of the Commandments concerns the religious duties of believers; worshipping the Lord God alone, avoiding idolatry, not using the Lord's name in vain, and observing the Sabbath Day." *Id.* at 42. Although it rejected Kentucky's avowed secular purpose, *Stone* acknowledged that the Ten

The forty-five foot Christmas tree in *Allegheny*, displayed during the holiday season, obviously conveyed a primarily secular, holiday message to a viewer. *See* 492 U.S. at 616 (Blackmun, J.); *id.* at 633 (O'Connor, J., concurring). In this respect, the Christmas tree "emphasized the secular component of the message communicated by other elements of an accompanying holiday display, including the Chanukah menorah." *Id.* at 617. Without a clear historical or cultural message of its own, the Floral Clock would only draw attention to the Ten Commandments monument, the largest exhibit in the nearby display, and magnify the Commonwealth's endorsement of its religious message.

### 5.

In contrast to the holiday displays addressed by the Supreme Court in *Allegheny* and *Lynch*, and this Court in *City of Clawson*, the Commonwealth's display does not convey an easily discernible, unified theme to a reasonable observer. *See O'Bannon*, 259 F.3d at 773 (emphasizing absence of "unifying historical or legal significance" between display of the Ten Commandments and nearby monuments). Of the seven markers, three commemorate devoted civil servants, one commemorates a Kentucky humorist and writer, one welcomes visitors to Kentucky, one relates to the Civil War, and one memorializes prisoners of war and soldiers missing in action from the Vietnam War. Of this group, only one relates to a historical event before the twentieth century, and of the seven, only one, the marker commemorating journalist Joe Creason, celebrates a Kentuckian who has made cultural rather than governmental contributions. While all of the markers are important in their own right, and appropriately commemorate Kentucky's devoted civil servants, a reasonable observer will not be able to connect them to a unifying historical or cultural theme. In contrast, a reasonable observer who views a holiday display that features a Christmas creche along secular holiday symbols like Santa Claus, is likely to readily understand that the display conveys a holiday theme. Without a unifying theme to hold the display together, a reasonable observer could only view the

vicinity." 107 F. Supp. 2d at 786. In this respect, the Commonwealth's intended display is unlike the holiday display upheld by the Supreme Court in *Allegheny*. As previously discussed, Justice Blackmun reasoned that the county could permissibly display the eighteen-foot menorah, a symbol he viewed as having important secular and religious dimensions, in part because the display was physically dominated by a forty-five foot Christmas tree, a secular symbol in Justice Blackmun's view. *Allegheny*, 492 U.S. at 617 (Blackmun, J.). In this case, the religious symbol, the Ten Commandments, is the predominant element in the display. Accordingly, a reasonable observer is likely to believe that the religious message of the Ten Commandments is the dominant message of the display.

The Commonwealth argues the Floral Clock, one of the world's largest, counters the religious message of the monument. Notwithstanding the defendant's contention, it does not appear that the Commonwealth considers the Floral Clock to be part of the "cultural and historical display" identified in Section 8 of the Resolution. In its reply brief, the defendant states: "The display, which includes the monument and the resolution, will be dwarfed by the floral clock." (Rep. Br. at 21). In this respect, the Floral Clock is similar to the Christmas decorations and gallery forum in the Allegheny county courthouse. According to the Supreme Court, these features could not negate the endorsement effect of the creche because the record "demonstrate[d] that the creche, with its floral frame, was its own display distinct from any other decorations or exhibitions in the building." *Allegheny*, 492 U.S. at 598 n.48; *cf. City of Clawson*, 915 F.2d at 249 (plaintiff acknowledged that the entire display included public library and its decorations).

Even if we considered the Floral Clock in our analysis, it is unclear how the clock could reduce the appearance of endorsement of the Ten Commandments' religious message. To be sure, the Floral Clock is visually and architecturally impressive, but it is unclear if it communicates any particular message to a viewer, let alone a cultural or historical message.

Commandments could be integrated into a school curriculum as part of a larger study of "history, civilization, ethics, comparative religion" and similar subjects. 449 U.S. at 42.

Section 8 provides that the Commonwealth intends to display the Ten Commandments "to remind Kentuckians of the Biblical foundations of the laws of the Commonwealth."[2] In light of *Stone*, we are compelled to conclude that this avowed secular purpose, which is essentially the same secular purpose that the Commonwealth of Kentucky put forth in *Stone*, is insufficient, standing alone, to satisfy the secular purpose requirement. This does not end our inquiry, however, for as the Supreme Court recognized in *Stone*, context is critically important in evaluating a state's proffered secular purpose. *See id.*; *see also Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 771 (7th Cir. 2001), *cert. denied*, 122 S.Ct. 1173 (2002) ("Beyond assessing the purpose expressly articulated by the state, we ensure that the stated secular purpose is legitimate by also examining the context and the content of the display."). In assessing the Commonwealth's avowed secular purpose, we look to (1) the language of Section 8; (2) the language of the entire Resolution, with particular attention to the preamble clauses; and (3) the intended physical context of the Ten Commandments monument.

---

[2]In its brief, the defendant relies primarily on the language of Section 2, which deals with displays of the Ten Commandments in public school classrooms, in emphasizing its secular purpose. Its primary brief makes repeated references to the purpose set forth in Section 2 – "illustrating how the Bible and Ten Commandments have influenced the faith, morals, and character of American leaders who, in turn, have shaped American law, public policy, and institutions" – but only a single reference to Section 8, the provision actually at issue. While we take note of the entire Resolution, including Section 2, in assessing context, our first inquiry into the Commonwealth's intent must be the secular purpose actually set forth in the challenged provision.

1.

While Section 8 indicates that the Monument will be part of a cultural and historical display, the Resolution makes no mention of the other components of this display. Indeed, the Commonwealth did not reveal the contents of this display until it was in the midst of litigation. In our view, this indicates that the other components of the display are an afterthought, at best, secondary in importance to the Ten Commandments, and suggests that the Commonwealth acted with a predominantly religious purpose.

In examining Section 8, we also note that it codifies only the influence of the Ten Commandments on the law of the Commonwealth. Indeed, Section 7 of the Resolution states that the Commonwealth considers the Ten Commandments "to be *the* precedent legal code of the Commonwealth" (emphasis added). *Compare Books*, 532 U.S. 1058, 121 S.Ct. at 2211 (Rehnquist, C.J., dissenting from denial of certiorari) (noting that the Commandments "have made *a* substantial contribution to our secular legal code") (emphasis added). In this respect, the Ten Commandments monument is unlike the frieze on the wall of the Supreme Court, which depicts Moses carrying the Ten Commandments alongside Confucius, Mohammed, Caesar Augustus, William Blackstone, Napoleon Bonaparte, and John Marshall. *See Allegheny*, 492 U.S. at 652 (Stevens, J., concurring in part and dissenting in part). While the Commonwealth need not commemorate every arguable historical influence on the laws of the Commonwealth or keep current with the views of every scholar to ensure compliance with the Establishment Clause, we cannot ignore its decision to focus only on the "Biblical foundations" of the law. Of course, our concern is with religious liberty, not intellectual or academic orthodoxy. We have neither the desire nor the authority to resolve disputes about whether the Commonwealth's legal system owes more to the Magna Carta or the Code of Hammurabi than the Ten Commandments. But that said, in addressing the Commonwealth's avowed secular purpose for displaying an overtly religious symbol such as the Ten Commandments, we

square with the proposition that the monument expresses no particular religious preference – particularly when considered in conjunction with those facts that the dissent does acknowledge – namely, that the monument also depicts two Stars of David and a symbol composed of the Greek letters Chi and Rho superimposed on each other that represent Christ.").

As a general matter, the inclusion of secular symbols in a display may dilute a message of religious endorsement. In this case, however, the monument's combination of revered secular symbols like the American flag and the Ten Commandment serves to link government and religion in an impermissible fashion. Thus, we also agree with the Seventh Circuit that the inclusion of an American eagle gripping the national colors at the top of the monument, serves to heighten the appearance of government endorsement of religion. *See* 235 F.3d at 307.

Additionally, we do not believe the fact that the monument indicates that the Eagles, a service organization, donated the monument reduces or dilutes the religious emphasis of the monument. It seems to us that a reasonable observer would know that the Eagles donated the monument with a religious purpose in mind – to teach young people "the simple laws of God." *See Capitol Sq. Rev. & Advisory Bd.*, 243 F.3d at 303 (acknowledging that, as a matter of law, a reasonable observer is idealized to be better informed than average and aware of the origins of Ohio's motto). Even if such knowledge could not be directly imputed to a reasonable observer, such an observer would likely nevertheless infer from the plainly religious nature of the Ten Commandments that the monument was donated with a religious theme in mind.

4.

The Ten Commandments monument physically dominates the "historical and cultural display" in the Capitol garden area. First, as the district court noted, "the sheer dimensions of this granite monolith would dwarf all the other memorials to deceased veterans and dedicated public servants in the

under government ownership and control that every display on its property is marked implicitly with government approval.") (citation and internal quotation omitted); *Doe v. City of Clawson*, 915 F.2d 244, 249 (6th Cir. 1990) (stating that the location of a Christmas creche at city hall implied that it had the "support and approval" of the city). And as in *Allegheny*, its prominent placement sends an unmistakable message that the Commonwealth of Kentucky endorses the religious message of the Ten Commandments.[4] The question, then, is whether the context of the display reduces or dilutes this endorsement.

### 3.

We agree with the Seventh Circuit's conclusion that the design of a monument in this manner emphasizes its religious message and compounds the endorsement inherent in the display of the Ten Commandments at the heart of state government. *See Books*, 235 F.3d at 302. The Ten Commandments occupy the bulk of the surface area and accordingly plainly dominate the monument. Moreover, if an individual reads the monument, the first feature he or she would encounter would be the prefatory words "I AM the LORD thy God" set out in large lettering at the top of the text. The bottom of the monument also conveys an unambiguously religious message – it features two Stars of David and the Chi Rho Christ symbol. *See id.*; *see also Books*, 532 U.S. 1058, 121 S.Ct. at 2210 (Stevens, J., respecting the denial of the petition for writ of certiorari) ("The graphic emphasis on those first lines [I AM the LORD thy God] is rather hard to

---

[4] Although plaintiffs contend that the Ten Commandments monument contains an exclusively Protestant version of the Ten Commandments, the Seventh Circuit's summary of the history of the monuments donated by the Eagles indicates that the version depicted on the monument was prepared with input from the Roman Catholic, Protestant and Jewish faiths. *Books*, 235 F.3d at 294-95. We need not resolve this factual dispute because it does not affect our conclusion in this case. *See Allegheny*, 492 U.S. at 615 (Blackmun, J.) ("The simultaneous endorsement of Judaism and Christianity is no less constitutionally infirm than the endorsement of Christianity alone.").

cannot ignore the Commonwealth's adoption of a view that emphasizes a single religious influence to the exclusion of all other religious and secular influences. *See Books*, 532 U.S. 1058, 121 S.Ct. at 2211 (Rehnquist, C.J., dissenting from denial of certiorari) (noting that the Commandments "have made a substantial contribution to our secular legal code").

### 2.

As to legislative context, the Resolution, which is to be posted on the Ten Commandments monument, sets forth a series of seventeen introductory "Whereas" clauses. Ten of these clauses include quotations from famous Americans extolling the virtues of religion, Christianity and the Bible. *Supra* Section I.B. These statements, as the defendant concedes, undoubtedly have a "religious meaning." (Rep. Br. at 13). Nevertheless, the defendant contends the preamble clauses are intended to "illustrate the religious thoughts of our nation's leaders and the Bible's influence on law and public policy." According to the defendant, "[i]n that special function, the quotes and references achieve the Commonwealth's secular goal by commemorating how the Bible and Ten Commandments influenced a nation." The primary problem with the defendant's position is that it is notably absent from the preamble. Thus, even without assessing whether such a disclaimer could reduce the religious meaning contained in these statements, we are unpersuaded by the defendant's argument. By waiting until its reply brief to put forth a secular explanation for statements with an agreed religious meaning, the Commonwealth again suggests that its asserted secular justification is intended merely to avoid Establishment Clause liability rather than to actually further a legitimate secular purpose.

### 3.

Although Section 8 is silent as to the content of the "historical and cultural display," the defendant, in the course of this litigation, has clarified that the Ten Commandments will be displayed along with seven other signs or markers. *Supra* Section I.B. While the presence of these other secular

symbols supports the defendant's claim of secular purpose more than a display that featured only the Ten Commandments would, the fact that the Ten Commandments monument physically dwarfs all of these other markers implies that they are secondary in importance to the Ten Commandments and suggests that the Commandments, and their religious message, are the primary focus of the display. *See O'Bannon*, 259 F.3d at 771 ("[T]he display of secular texts along with the Ten Commandments does not automatically lead to a finding that the purpose in erecting a monument is primarily secular.").

In light of (1) the Supreme Court's recognition of the inherently religious nature of the Ten Commandments, *see Stone*, 449 U.S. at 41; (2) the Commonwealth's failure to identify the other components of the "cultural and historical display" referenced in Section 8 until litigation; (3) the Commonwealth's exclusive focus on the Ten Commandments as the source of Commonwealth law; (4) the overtly religious nature of the Resolution's preamble clauses; and (5) the fact that the Ten Commandments monument will be the largest in the display, we conclude that the Commonwealth has not established a secular purpose for the display of the Ten Commandments monument on the Capitol grounds.[3] *See also*

[3] In evaluating the Commonwealth's avowed secular purpose, we do not rely on the comments attributed to State Senator Albert Robinson in a February 16, 2000, Louisville Courier-Journal article. *Cf. Wallace v. Jaffree*, 472 U.S. 38, 74, 105 S. Ct. 2479, 86 L. Ed. 2d (1985) (O'Connor, J., concurring) ("It is particularly troublesome to denigrate an expressed secular purpose due to postenactment testimony by particular legislators or by interested persons who witnessed the drafting of the statute."). State Senator Robinson is quoted as having said: "When the boat came to these great shores, it did not have an atheist, a Buddhist, a Hindu, a Muslim, a Christian and a Jew . . . Ninety-eight percent plus of these people were Christians."

Similarly, we do not rely on the fact that the district courts in Kentucky have recently addressed a number of challenges to Ten Commandments displays. While it is certainly plausible that the Kentucky Senate's efforts to display the Ten Commandments were part of a larger Kentucky-wide campaign or part of a larger trend, there is not

Justice Blackmun, writing for himself, concluded that the display of the menorah was constitutional. According to Justice Blackmun, the menorah did not send an exclusively religious message, but rather had secular as well as religious dimensions. *Id.* at 613-14. Moreover, he emphasized that the forty-five-foot Christmas tree, a secular symbol in Justice Blackmun's view, was the "predominant element in the city's display" because of its size and its central position. *Id.* at 617. While acknowledging that "no sign can disclaim an overwhelming message of endorsement," Justice Blackmun also noted that the sign proclaiming a salute to liberty diminished the possibility that the tree and menorah would be interpreted as a dual endorsement of religion. *Id.* at 619.

Although she disagreed with Justice Blackmun's assessment of the menorah, Justice O'Connor also concluded that the display of the menorah did not violate the Establishment Clause. *Id.* at 632-36. Justice O'Connor explained: "By accompanying its display of a Christmas tree – a secular symbol of the Christmas holiday season – with a salute to liberty, and by adding a religious symbol from a Jewish holiday also celebrated at roughly the same time of year, I conclude that the city did not endorse Judaism or religion in general, but rather conveyed a message of pluralism and freedom of belief during the holiday season." *Id.* at 635.

### 2.

The Ten Commandments monument is prominently located at the very center of the Commonwealth's government – the State Capitol and site of all three branches of Kentucky government. The Commonwealth intends to position the Ten Commandments in the highly visible Capitol garden area, where it can be seen by motorists driving on the road between the Capitol and the Capitol Annex. Like the unconstitutional creche display in *Allegheny*, "[n]o viewer could reasonably think that it occupies this location without the support and approval of the government." 429 U.S. at 600; *see also Books*, 235 F.3d at 305 ("[T]he seat of government "is so plainly

*O'Bannon*, 259 F.3d at 771 (rejecting avowed secular purpose of honoring history and honoring this country's legal system for display of Ten Commandments); *Books*, 235 F.3d at 304 (holding that defendant city's "avowed secular purpose of displaying the Ten Commandments issued on the eve of litigation 'is not sufficient to avoid conflict with the First Amendment.'") (quoting *Stone*, 449 U.S. at 41).

4.

In many instances, a state or local government considering the display of a monument or symbol with religious components faces a difficult decision. Such a display may provoke legal challenge, but the task of assessing whether such a display comports with the Establishment Clause is often an uncertain one hinging on the factual specifics of each case, and often times, the line between an unconstitutional display and a constitutional display will be quite narrow. *See Lynch,* 465 U.S. at 694 (O'Connor, J., concurring) ( noting that "[e]very government practice must be judged in its unique circumstances"); *Pinette,* 515 U.S. at 778

sufficient evidence in the record to link these various cases. *See American Civil Liberties Union v. Grayson County, Kentucky*, N. 4:01CV-202-M, 2002 WL 1558688, at *6 (W.D. Ky. May 13, 2002) (preliminarily enjoining display of Ten Commandments as part of "Foundations of American Law and Government" display in the Grayson County Courthouse); *American Civil Liberties Union of Kentucky v. McCreary County, Kentucky*, 145 F.Supp.2d 845, 853 (E.D. Ky. 2001) (permanently enjoining display of Ten Commandments display in the McCreary and Pulaski County courthouses and the Harlan County schools); *Doe v. Musselman*, 96 F. Supp.2d 667 (E.D. Ky. 2000) (preliminarily enjoining Ten Commandments display in public schools); *see also American Civil Liberties Union v. Rutherford County*, No. 3:02-0396, 2002 WL 1400202, at *13 (M.D. Tenn. June 21, 2002) (preliminarily enjoining display of the Ten Commandments as part of the "Foundations of American Law and Government" display in the Rutherford County Courthouse); *American Civil Liberties Union v. Hamilton County, Tennessee*, 202 F. Supp.2d 757, 767 (E.D. Tenn. 2002) (declaring Hamilton County's display of the Ten Commandments at the Hamilton County Courthouse and the Hamilton County City Courts Building unconstitutional).

*id.* at 613-620 (Blackmun, J.); *id.* at 632-38 (O'Connor, J., concurring); *id.* at 655-679 (Kennedy, J., dissenting in part, concurring in part, joined by Rehnquist, C.J., White, J., Scalia, J.).

In declaring the creche display unconstitutional, the Court emphasized that the creche sent an "unmistakably clear" religious message and that "nothing in the context of the display detracts from the creche's religious message." *Id.* at 598. According to the Court, the presence of Santa Claus and other Christmas decorations in other areas of the county courthouse "fail[ed] to negate the endorsement effect of the creche" because they were not part of the display. *Id.* at n. 48. Moreover, the floral display surrounding the creche only drew attention to the religious message of the display and accordingly "contribute[d] to, rather than detract[ed] from, the endorsement of religion conveyed by the creche." *Id.* at 599.

Analyzing the location of the creche, the Court also stressed the county courthouse was the seat of the county government and emphasized that the county placed the creche on the grand staircase, the "main" and "most beautiful part" of the building. *Id.* The Court explained: "No reasonable viewer could reasonably think that it occupies this location without the support and approval of government. Thus, by permitting the 'display of the creche in this particular physical setting,' the county sends an unmistakable message that it supports and promotes the Christian praise to God that is the creche's religious message." *Id.* at 599-600 (quoting *Lynch*, 465 U.S. at 692) (O'Connor, J., concurring) (footnote omitted)). As Justice O'Connor observed in her separate concurring opinion, "The display of religious symbols in public areas of core government buildings runs a special risk of making religion relevant, in reality or public perception, to status in the political community." *Id.* at 626; *see also id.* at 650 (Stevens, J., concurring) (asserting that "the Establishment Clause should be construed to create a strong presumption against the display of religious symbols on public property.").

("Conducting the review of government action required by the Establishment Clause is always a sensitive matter."). Given the uncertainty with which state and local governments must often act, we believe that it is particularly appropriate to accord a measure of deference to a state or local government's avowed secular purpose and to refrain from hastily imputing unconstitutional motives to state legislators.

This case, however, does not present a situation where a state government, faced with considerable uncertainty regarding the constitutionality of a display with religious components, carefully deliberated to ensure that the display did not run afoul of the Establishment Clause. As to notice, the Commonwealth not only had the benefit of a Supreme Court case holding that the mere recitation of a secular purpose for the display of the Ten Commandments was not sufficient to pass Establishment Clause scrutiny, but the Commonwealth actually litigated the case. Instead of using *Stone* as a guidepost, the Commonwealth put forth virtually the same secular purpose in this case that the Court rejected in *Stone*. More importantly, instead of drafting a Resolution heeding *Stone*'s suggestion to integrate the Ten Commandments into a broader study, the Resolution merely mentions an unspecified "cultural and historical display" and makes no effort to identify the components of the display. It may be that rejecting a government's avowed secular purpose is the exception rather than the rule, but on the facts of this case, we find that Kentucky's primary purpose in drafting Section 8 was religious rather than secular.

## B.

Even if we were to disregard the Commonwealth's religious purpose in displaying the Ten Commandments, we would conclude that the Ten Commandments monument impermissibly endorses religion. While our examination of the Commonwealth's proffered purpose looks to the intended effect of the display, our inquiry into whether the display endorses religion examines its actual effect. *See Allegheny*, 492 U.S. at 596. In evaluating whether the Ten

Commandments display violates the Establishment Clause, we ask "whether an objective observer, acquainted with the text, legislative history, and implementation" of the enactment would view it as state endorsement of religion. *Santa Fe Indep. School Dist.*, 530 U.S. at 308 (citations omitted); *American Civil Liberties Union v. Capitol Square Review & Advisory Bd.*, 243 F.3d 289, 302-03 (6th Cir. 2001). In making this inquiry, we do not allow a state "to hide behind the application of formally neutral criteria and remain studiously oblivious to the effects of its actions." *Pinette*, 515 U.S. at 777. Accordingly, we look to both the specific content of the display and the context of its presentation. *See Allegheny*, 492 U.S. at 598.

### 1.

In *Lynch*, the Supreme Court ruled that a city's display of a Christmas creche in a park owned by a nonprofit organization as part of a holiday display which included a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cutout figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, and a large banner reading "Seasons Greetings" did not violate the Establishment Clause. 465 U.S. at 671, 681-84. In a concurring opinion Justice O'Connor acknowledged that the creche was a symbol of religious significance but reasoned that the display, when considered in the context of the larger holiday setting, did not convey an endorsement of religion. *Id.* at 692. Instead, the display celebrated a public holiday with strong secular components. *Id.*

Five years later, the Supreme Court addressed a similar Establishment Clause challenge to a Christmas creche located on a county courthouse staircase and a Chanukah menorah located in front of the city-county building. *See Allegheny*, 492 U.S. at 581-82. Justice Blackmun, writing for a majority, concluded that the creche display violated the Establishment Clause, *id.* at 598-99, and in a series of opinions, the Justices agreed that the menorah was constitutionally permissible, *see*