Justice Souter,
with whom Justice Stevens and Justice Ginsburg join,
dissenting.
Although the First Amendment’s Religion Clauses have not been read to mandate absolute governmental neutrality toward religion, cf. Sherbert v. Verner, 374 U. S. 398 (1963), the Establishment Clause requires neutrality as a general rule, e. g., Everson v. Board of Ed. of Ewing, 330 U. S. 1, 18 (1947), and thus expresses Madison’s condemnation of “employ [ing] Religion as an engine of Civil policy,” Memorial and Remonstrance Against Religious Assessments, 2 Writings of James Madison 183,187 (G. Hunt ed. 1901). A governmental display of an obviously religious text cannot be squared with neutrality, except in a setting that plausibly indicates that the statement is not placed in view with a predominant purpose on the part of government either to adopt the religious message or to urge its acceptance by others.
Until today, only one of our cases addressed the constitutionality of posting the Ten Commandments, Stone v. Graham, 449 U. S. 39, 41-42 (1980) (per curiam). A Kentucky statute required posting the Commandments on the walls of public school classrooms, and the Court described the State’s purpose (relevant under the tripartite test laid out in Lemon v. Kurtzman, 403 U. S. 602 (1971)), as being at odds with the obligation of religious neutrality.
“The pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature. The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact. The Commandments do not con *738 fine themselves to arguably secular matters, such as honoring one’s parents, killing or murder, adultery, stealing, false witness, and covetousness. Rather, the first part of the Commandments concerns the religious duties of believers: worshipping the Lord God alone, avoiding idolatry, not using the Lord’s name in vain, and observing the Sabbath Day.” 449 U. S., at 41-42 (footnote and citations omitted).
What these observations underscore are the simple realities that the Ten Commandments constitute a religious statement, that their message is inherently religious, and that the purpose of singling them out in a display is clearly the same.[1]
Thus, a pedestrian happening upon the monument at issue here needs no training in religious doctrine to realize that the statement of the Commandments, quoting God himself, proclaims that the will of the divine being is the source of obligation to obey the rules, including the facially secular ones. In this case, moreover, the text is presented to give particular prominence to the Commandments’ first sectarian *739 reference, “I am the Lord thy God.” That proclamation is centered on the stone and written in slightly larger letters than the subsequent recitation. To ensure that the religious nature of the monument is clear to even the most casual passerby, the word “Lord” appears in all capital letters (as does the word “am”), so that the most eye-catching segment of the quotation is the declaration “I AM the LORD thy God.” App. to Pet. for Cert. 21. What follows, of course, are the rules against other gods, graven images, vain swearing, and Sabbath breaking. And the full text of the fifth Commandment puts forward filial respect as a condition of long life in the land “which the Lord thy God giveth thee.” See ibid. These “words ... make [the] religious meaning unmistakably clear.” County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U. S. 573, 598 (1989).
To drive the religious point home, and identify the message as religious to any viewer who failed to read the text, the engraved quotation is framed by religious symbols: two tablets with what appears to be ancient script on them, two Stars of David, and the superimposed Greek letters Chi and Rho as the familiar monogram of Christ. Nothing on the monument, in fact, detracts from its religious nature,[2] see ibid. (“Here, unlike in Lynch [v. Donnelly, 465 U. S. 668 (1984)], nothing in the context of the display detracts from the creche’s religious message”), and the plurality does not suggest otherwise. It would therefore be difficult to miss the point that the government of Texas[3] is telling everyone *740 who sees the monument to live up to a moral code because God requires it, with both code and conception of God being rightly understood as the inheritances specifically of Jews and Christians. And it is likewise unsurprising that the District Court expressly rejected Texas’s argument that the State’s purpose in placing the monument on the Capitol grounds was related to the Commandments’ role as “part of the foundation of modern secular law in Texas and elsewhere.” App. to Pet. for Cert. 32.
The monument’s presentation of the Commandments with religious text emphasized and enhanced stands in contrast to any number of perfectly constitutional depictions of them, the frieze of our own Courtroom providing a good example, where the figure of Moses stands among history’s great lawgivers. While Moses holds the tablets of the Commandments showing some Hebrew text, no one looking at the lines of figures in marble relief is likely to see a religious purpose behind the assemblage or take away a religious message from it. Only one other depiction represents a religious leader, and the historical personages are mixed with symbols of moral and intellectual abstractions like Equity and Authority. See County of Allegheny, supra, at 652 (Stevens, J., concurring in part and dissenting in part). Since Moses enjoys no especial prominence on the frieze, viewers can readily take him to be there as a lawgiver in the company of other lawgivers; and the viewers may just as naturally see the tablets of the Commandments (showing the later ones, forbidding things like killing and theft, but without the divine preface) as background from which the concept of law *741 emerged, ultimately having a secular influence in the history of the Nation. Government may, of course, constitutionally call attention to this influence, and may post displays or erect monuments recounting this aspect of our history no less than any other, so long as there is a context and that context is historical. Hence, a display of the Commandments accompanied by an exposition of how they have influenced modern law would most likely be constitutionally unobjectionable.[4] *742 And the Decalogue could, as Stone suggested, be integrated constitutionally into a course of study in public schools. 449 U. S., at 42.[5]
Texas seeks to take advantage of the recognition that visual symbol and written text can manifest a secular purpose in secular company, when it argues that its monument (like Moses in the frieze) is not alone and ought to be viewed as only 1 among 17 placed on the 22 acres surrounding the State Capitol. Texas, indeed, says that the Capitol grounds are like a museum for a collection of exhibits, the kind of setting that several Members of the Court have said can render the exhibition of religious artifacts permissible, even though in other circumstances their display would be seen as meant to convey a religious message forbidden to the State. County of Allegheny, 492 U. S., at 595 (opinion of Blackmun, J., joined by Stevens, J.); Lynch v. Donnelly, 465 U. S. 668, 692 (1984) (O’Connor, J., concurring). So, for example, the Government of the United States does not violate the Establishment Clause by hanging Giotto’s Madonna on the wall of the National Gallery.
But 17 monuments with no common appearance, history, or esthetic role scattered over 22 acres is not a museum, and anyone strolling around the lawn would surely take each memorial on its own terms without any dawning sense that some purpose held the miscellany together more coherently *743 than fortuity and the edge of the grass. One monument expresses admiration for pioneer women. One pays respect to the fighters of World War II. And one quotes the God of Abraham whose command is the sanction for moral law. The themes are individual grit, patriotic courage, and God as the source of Jewish and Christian morality; there is no common denominator. In like circumstances, we rejected an argument similar to the State’s, noting in County of Allegheny that “[t]he presence of Santas or other Christmas decorations elsewhere in the .. . [c]ourthouse, and of the nearby gallery forum, fail to negate the [creche’s] endorsement effect. . . . The record demonstrates .. . that the creche, with its floral frame, was its own display distinct from any other decorations or exhibitions in the building.” 492 U. S., at 598-599, n. 48.[6]
If the State’s museum argument does nothing to blunt the religious message and manifestly religious purpose behind it, neither does the plurality’s reliance on generalities culled from cases factually different from this one. E. g., ante, at 687 (“We have acknowledged, for example, that ‘religion has been closely identified with our history and government,’ School Dist. of Abington Township v. Schempp, 374 U. S., at 212, and that ‘[t]he history of man is inseparable from the *744 history of religion,' Engel v. Vitale, 370 U. S. 421, 434 (1962)”). In fact, it is not until the end of its opinion that the plurality turns to the relevant precedent of Stone, a case actually dealing with a display of the Decalogue.
When the plurality Anally does confront Stone, it tries to avoid the case’s obvious applicability by limiting its holding to the classroom setting. The plurality claims to And authority for limiting Stone’s reach this way in the opinion’s citations of two school-prayer cases, School Dist. of Abington Township v. Schempp, 374 U. S. 203 (1963), and Engel v. Vitale, 370 U. S. 421 (1962). But Stone relied on those cases for widely applicable notions, not for any concept speciAc to schools. The opinion quoted Schempp’s statements that “it is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment,” Schempp, supra, at 225, quoted in Stone, 449 U. S., at 42; and that “the place of the Bible as an instrument of religion cannot be gainsaid,” Schempp, supra, at 224, quoted in Stone, supra, at 41, n. 3. And Engel was cited to support the proposition that the State was responsible for displaying the Commandments, even though their framed, printed texts were bought with private subscriptions. Stone, supra, at 42 (“[T]he mere posting of the [Commandments] under the auspices of the legislature provides the ofAcial support of the State Government that the Establishment Clause prohibits” (ellipsis and internal quotation marks omitted)). Thus, the schoolroom was beside the point of the citations, and that is presumably why the Stone Court failed to discuss the educational setting, as other opinions had done when school was signiAcant. E. g., Edwards v. Aguillard, 482 U. S. 578, 584 (1987). Stone did not, for example, speak of children’s impressionability or their captivity as an audience in a school class. In fact, Stone’s reasoning reached the classroom only in noting the lack of support for the claim that the State had brought the Commandments into schools in order to “integrate] [them] into the school curriculum.” 449 U. S., at 42. *745 Accordingly, our numerous prior discussions of Stone have never treated its holding as restricted to the classroom.[7]
Nor can the plurality deflect Stone by calling the Texas monument “a far more passive use of [the Decalogue] than was the case in Stone, where the text confronted elementary school students every day.” Ante, at 691. Placing a monument on the ground is not more “passive” than hanging a sheet of paper on a wall when both contain the same text to be read by anyone who looks at it. The problem in Stone was simply that the State was putting the Commandments there to be seen, just as the monument’s inscription is there for those who walk by it.
To be sure, Kentucky’s compulsory-education law meant that the schoolchildren were forced to see the display every day, whereas many see the monument by choice, and those who customarily walk the Capitol grounds can presumably avoid it if they choose. But in my judgment (and under our often inexact Establishment Clause jurisprudence, such matters often boil down to judgment, see ante, at 700 (Breyer, J., concurring in judgment)), this distinction should make no difference. The monument in this case sits on the grounds of the Texas State Capitol. There is something significant in the common term “statehouse” to refer to a state capítol building: it is the civic home of every one of the State’s citizens. If neutrality in religion means something, any citizen should be able to visit that civic home without having to confront religious expressions clearly meant to convey an official religious position that may be at odds with his own *746 religion, or with rejection of religion. See County of Allegheny, 492 U. S., at 626 (O’Connor, J., concurring in part and concurring in judgment) (“I agree that the creche displayed on the Grand Staircase of the Allegheny County Courthouse, the seat of county government, conveys a message to nonad-herents of Christianity that they are not full members of the political community .... The display of religious symbols in public areas of core government buildings runs a special risk of making religion relevant, in reality or public perception, to status in the political community” (alteration and internal quotation marks omitted)).
Finally, though this too is a point on which judgment will vary, I do not see a persuasive argument for constitutionality in the plurality’s observation that Van Orden’s lawsuit comes “[fjorty years after the monument’s erection . . . ,” ante, at 682, an observation that echoes the State’s contention that one fact cutting in its favor is that “the monument had stood in Austin ... for some forty years without generating any controversy or litigation,” Brief for Respondents 25. It is not that I think the passage of time is necessarily irrelevant in Establishment Clause analysis. We have approved framing-era practices because they must originally have been understood as constitutionally permissible, e. g., Marsh v. Chambers, 463 U. S. 783 (1983) (legislative prayer), and we have recognized that Sunday laws have grown recognizably secular over time, McGowan v. Maryland, 366 U. S. 420 (1961). There is also an analogous argument, not yet evaluated, that ritualistic religious expression can become so numbing over time that its initial Establishment Clause violation becomes at some point too diminished for notice. But I do not understand any of these to be the State’s argument, which rather seems to be that 40 years without a challenge shows that as a factual matter the religious expression is too tepid to provoke a serious reaction and constitute a violation. Perhaps, but the writer of Exodus chapter 20 was not lukewarm, and other explanations may do better in accounting *747 for the late resort to the courts. Suing a State over religion puts nothing in a plaintiff’s pocket and can take a great deal out, and even with volunteer litigators to supply time and energy, the risk of social ostracism can be powerfully deterrent. I doubt that a slow walk to the courthouse, even one that took 40 years, is much evidentiary help in applying the Establishment Clause.
I would reverse the judgment of the Court of Appeals.

 The clarity of the religious manifestation in Stom was unaffected by the State’s effort to obscure it: the Kentucky statute that mandated posting the Commandments in classrooms also required the addition to every posting of a notation reading, “[t]he secular application of the Ten Commandments is clearly seen in its adoption as the fundamental legal code of Western Civilization and the Common Law of the United States.” 449 U. S., at 39-40, n. 1 (internal quotation marks omitted).
In the present case, the religious purpose was evident on the part of the donating organization. When the Fraternal Order of Eagles, the group that gave the monument to the State of Texas, donated identical monuments to other.jurisdictions, it was seeking to impart a religious message. See Adland v. Russ, 307 F. 3d 471, 475 (CA6 2002) (quoting the Eagles’ statement in a letter written to Kentucky when a monument was donated to that Commonwealth: ‘“Most of today’s younger generation either have not seen the Ten Commandments or have not been taught them. In our opinion the youth of today is in dire need of learning the simple laws of God ... ’ ”). Accordingly, it was not just the terms of the moral code, but the proclamation that the terms of the code were enjoined by God, that the Eagles put forward in the monuments they donated.

 That the monument also surrounds the text of the Commandments with various American symbols (notably the U. S. flag and a bald eagle) only underscores the impermissibility of Texas’s actions: by juxtaposing these patriotic symbols with the Commandments and other religious signs, the monument sends the message that being American means being religious (and not just being religious but also subscribing to the Commandments, i. e., practicing a monotheistic religion).

 There is no question that the State in its own right is broadcasting the religious message. When Texas accepted the monument from the Eagles, the state legislature, aware that the Eagles “for the past several years *740 have placed across the country .. . parchment plaques and granite monoliths of the Ten Commandments [in order] to promote youth morality and to help stop the alarming increase in delinquency,” resolved “that the Fraternal Order of the Eagles of the State of Texas be commended and congratulated for its efforts and contributions in combating juvenile delinquency throughout our nation.” App. 97. The State, then, expressly approved of the Eagles’ proselytizing, which it made on its own.

 For similar reasons, the other displays of the Commandments that the plurality mentions, ante, at 688-689, do not run afoul of the Establishment Clause. The statues of Moses and St. Paul in the Main Reading Room of the Library of Congress are 2 of 16 set in close proximity, statues that “represent men illustrious in the various forms of thought and activity .. . .” The Library of Congress: The Art and Architecture of the Thomas Jefferson Building 127 (J. Cole and H. Reeds eds. 1997). Moses and St. Paul represent religion, while the other 14 (a group that includes Beethoven, Shakespeare, Michelangelo, Columbus, and Plato) represent the nonreligious categories of philosophy, art, history, commerce, science, law, and poetry. Ibid. Similarly, the sculpture of the woman beside the Decalogue in the Main Reading Room is 1 of 8 such figures “representing] eight characteristic features of civilized life and thought,” the same 8 features (7 of them nonreligious) that Moses, St. Paul, and the rest of the 16 statues represent. Id., at 125.
The inlay on the floor of the National Archives Building is one of four such discs, the collective theme of which is not religious. Rather, the discs “symbolize the various types of Government records that were to come into the National Archives.” Letter from Judith A. Koucky, Archivist, Records Control Section, to Catherine Millard (Oct. 1, 2003), http://www.christianheritagemins.org/articles/Ten_Commandments/ Letter_archivist.htm (as visited June 16, 2005, and available in Clerk of Court’s case file). (The four categories are war and defense, history, justice, and legislation. Each disc is paired with a winged figure; the disc containing the depiction of the Commandments, a depiction that, notably, omits the Commandments’ text, is paired with a figure representing legislation. Ibid.)
As for Moses’s “prominen[t] featuring] in the Chamber of the United States House of Representatives,” ante, at 689 (plurality opinion), Moses is actually 1 of 23 portraits encircling the House Chamber, each approximately the same size, having no religious theme. The portraits depict “men noted in history for the part they played in the evolution of what *742 has become American law.” Art in the United States Capitol, House Doc. No. 94-660, p. 282 (1978). More importantly for purposes of this case, each portrait consists only of the subject’s face; the Ten Commandments appear nowhere in Moses’s portrait.

 Similarly permissible, though obviously of a different character, are laws that can be traced back to the Commandments (even the more religious ones) but are currently supported by nonreligious considerations. See McCreary County v. American Civil Liberties Union of Ky., post, at 861 (opinion of the Court) (noting that in McGowan v. Maryland, 866 U. S. 420 (1961), the Court “upheld Sunday closing statutes on practical, secular' grounds after finding that the government had forsaken the religious purposes behind centuries-old predecessor laws”).

 It is true that the Commandments monument is unlike the display of the Commandments considered in the other Ten Commandments case we decide today, McCreary County. There the Commandments were posted at the behest of the county in the first instance, whereas the State of Texas received the monument as a gift from the Eagles, which apparently conceived of the donation at the suggestion of a movie producer bent on promoting his commercial film on the Ten Commandments, Books v. Elkhart, 235 F. 3d 292, 294-295 (CA7 2000), cert. denied, 532 U. S. 1058 (2001). But this distinction fails to neutralize the apparent expression of governmental intent to promote a religious message: although the nativity scene in County of Allegheny was donated by the Holy Name Society, we concluded that “[n]o viewer could reasonably think that [the scene] occupies [its] location [at the seat of county government] without the support and approval of the government.” 492 U. S., at 599-600.

 In any event, the fact that we have been, as the plurality says, “ ‘particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools,’ ” ante, at 691, does not of course mean that anything goes outside the schoolhouse. As cases like County of Allegheny and Lynch v. Donnelly, 465 U. S. 668 (1984), illustrate, we have also closely scrutinized government displays of religious symbols. And for reasons discussed in the text, the Texas monument cannot survive even a relaxed level of scrutiny.